IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANTOINE SMALL, JR.              :              CIVIL ACTION
                                :
        v.                      :
                                :
CITY OF PHILADELPHIA, ET AL.    :              NO. 05-5291

## MEMORANDUM

**Padova, J.**                                    **February 26, 2007**

This action arises from the shooting of Plaintiff, Antoine Small, Jr., by his fellow Philadelphia Police Officer, Detective Robert Redanauer, during the arrest of Benjamin Hunter on a warrant for domestic assault. Plaintiff has asserted claims against Defendants, the City of Philadelphia and Detective Redanauer, pursuant to 42 U.S.C. § 1983 and state law, alleging that the shooting violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution, Article 1, Sections 1 and 8 of the Pennsylvania Constitution, and amounted to assault, battery and negligent infliction of emotional distress. Before the Court is Defendants' Motion for Summary Judgment. For the reasons which follow, Defendants' Motion is granted in part and denied in part.

I.      BACKGROUND

Plaintiff was shot by Redanauer on December 9, 2003. (Redanauer Dep. at 6.) Between 5:00 p.m. and 6:00 p.m. on the evening of December 9, 2003, Detective Stephan Grace, Redanauer's partner, informed Redanauer that he had an arrest warrant for Benjamin Hunter and that the complainant on the warrant had called him and said that Hunter wanted to meet her at the intersection of 13th Street and Allegheny Avenue in Philadelphia. (Id. at 6-7.) The complainant also told Grace that Hunter had a gun, was wearing a bulletproof vest, would be bringing help, and had

told her not to bring the police.  (Id. at 7.)  Redanauer and Grace immediately got their equipment, bulletproof vests and guns,  and Redanauer drove Grace down Broad Street toward the intersection of 13th and Allegheny.  (Id. at 8.)

Redanauer and Grace also called members of the Five Squad, Police Officers Mocharnak, Hernandez, Small and Fegley, who are usually in plain clothes and driving unmarked cars, to assist with the arrest of Hunter.  (Id. at 8-9.)  On their way to 13th and Allegheny,  Redanauer and Grace stopped in the parking lot of a KFC at the intersection of Broad and Clearfield Roads to meet with the Five Squad officers, who were all in another car, to plan Hunter's arrest.  (Id. at 9, 15.)  None of the officers exited their cars for this meeting, which lasted between three and five minutes.  (Id. at 9, 14.)  Grace told the Five Squad officers that they had a warrant for Hunter, who would be armed with a handgun and wearing a bulletproof vest; described the car that Hunter was driving; and instructed the Five Squad officers that, when they executed the warrant, the Five Squad Officers should stay on one side of Hunter's car while the Detectives were on the other side.  (Id. at 10, Small Dep. at 23.)  The Detectives also told the Five Squad officers that if anyone was to see the car or Hunter, they were to get on the radio and inform everyone, but did not give the Five Squad Officers any direction as to who would approach Hunter when he arrived or who would give Hunter directions or orders to effectuate the arrest. (Redanauer Dep. at 11-12.)

After leaving the KFC, the Five Squad officers initially drove to 13th and Allegheny, then left to respond to an assist officer call.  (Small Dep. at 23.)  Ten to fifteen minutes later, the Five Squad officers returned to the corner of 13th and Allegheny and parked their car on Allegheny facing eastbound.  (Id. at 24-25.)  The Five Squad officers could see the complainant from their parking place.  (Id. at 26.)  Plaintiff got out of the car and walked to a bus stop at the corner of 13th and

Allegheny to wait for Hunter.  (Id. at  26-27.)  While he waited for Hunter to arrive, he sat on the steps of a house about three feet north of the bus stop and spoke with his partner, Hernandez, by cell phone.  (Id. at 28.)

After speaking with the Five Squad officers, Redanauer and Grace drove directly to 13th and Allegheny and parked their car on the southeast corner of 13th and Camac Streets, arriving sometime between 6:00 and 6:30 p.m.  (Redanauer Dep. at 15-16.)  Redanauer stayed in the car while Grace got out of the car and crossed Allegheny Avenue to wait for Hunter to arrive.  (Id. at 17-18.)  Grace took their police car's handheld radio with him, leaving Redanauer (who had not brought his cellular phone) with no means of communication with the other police officers.  (Id. at 18-20.)

Approximately three minutes after he arrived at the corner of 13th and Camac Streets, Redanauer observed Grace make a thumbs up sign, indicating that Hunter had arrived.  (Id. at 20.)  Hunter stopped his car on the northeast corner of 13th and Allegheny, directly in front of the Plaintiff, and spoke with the complainant through his open car window.  (Id. at  23, Small Dep. at 28-29.)  At the time he first saw Hunter, Plaintiff could also see Grace to his east walking on the pavement while Redanauer slowly drove his car westbound.  (Small Dep. at 28-29.)  Plaintiff told Hernandez that they were going to go get Hunter, hung up the phone, drew his gun and pulled out his badge.  (Id. at 29, 33.)  As he approached Hunter's car, Plaintiff saw Redanauer pull up and cut off Hunter's car.   (Id. at 29.)  Redanauer stopped his car so that it was parallel to, and slightly in front of, Hunter's car.  (Redanauer Dep. at 25.)

Redanauer remembers that, as he drove up, the driver's side door of Hunter's car was open and Hunter had one foot out of the door and was waving at the complainant, who was also at the intersection of 13th and Allegheny.  (Id. at 24, 26.)  As Redanauer pulled up to Hunter's car,

3

inserting his car between Hunter and the complainant, he heard what sounded like a gunshot to the north.  (Id. at 27-28.  After hearing the gunshot, Redanauer saw the Plaintiff, who he recognized, walk from the northeast corner of 13th and Allegheny, from a porch or the area of some bushes, over to Hunter's car.  (Id. at 28-30.)  Redanauer saw Plaintiff approach the front passenger side of Hunter's car, Redanauer was on the driver's side of Hunter's car.  (Id. at 31.)  Redanauer saw that Plaintiff had a weapon drawn and heard Plaintiff give commands to Hunter to "let me see your hands."  (Id. at 32.)  Redanauer, who was still in his car with his gun out, was also giving commands to Hunter.  (Id. at 29.)

Plaintiff's and Redanauer's accounts of Hunter's actions immediately prior to the shooting differ in material respects.  Redanauer remembers that, when he first drove up to Hunter's car, Hunter's left foot was out of the car and his left hand was waving toward the complainant.  (Id. at 26, 33-34.)  Redanauer never saw Hunter's right hand.  (Id. at 34.)  Once Redanauer drove up to Hunter's car, Hunter shut the door of his car and Redanauer could no longer see Hunter's left hand. (Id. at 34-35.)  Redanauer then said, through his open passenger-side car window into Hunter's open driver-side car window:  "let me see your hands" several times and said "[p]olice.  This is the police. Let me see your hands."  (Id. at 35.)  During this time, Redanauer had his car in drive and his foot on the brake.  (Id. at 36.)  Accordingly to Redanauer, Hunter eventually put his head down toward his lap and threw up his left hand.  (Id. at 35-36.)  At this point, Redanauer, his gun pointing in Hunter's direction, ducked his head under the steering wheel and fired three shots in quick succession "rapid, no pause, no hesitation."  (Id. at 36-37.)  Even though Redanauer was aware that Plaintiff was standing close to the front passenger-side window of Hunter's car,  Redanauer did not look at Hunter when he fired.  (Id. at 38, 40.)  After he learned that Plaintiff had been shot,

Redanauer exited his vehicle and assisted Officer Mocharnak in taking Hunter into custody.  (Id. at 38.)  Hunter had not been hit by any of the shots fired by Redanauer and did not have a weapon or a bulletproof vest.  (Id. at 38-39, Pl. Ex. A at 2.)

Plaintiff remembers that, when he walked up to the front passenger-side window of Hunter's vehicle, Grace was at the rear of the vehicle.  (Small Dep. at 31.)  Redanauer had pulled his car up to Hunter's vehicle but Plaintiff did not see what Redanauer was doing because he was watching Hunter.  (Id. at 34.)    Plaintiff gave Hunter a command to "[t]urn the vehicle off."   (Id. at 31.)  Hunter had one hand on the steering wheel and the other hand on the gearshift and it appeared to Plaintiff that Hunter had put his vehicle in reverse.  (Id. at 32.)  Plaintiff gave Hunter another command to "[t]urn the vehicle off" and then heard two shots and felt a pain in his leg.  (Id.)  Plaintiff was shot in the right leg.  (Pl. Ex. A at 1.)  At the time that he was shot, Plaintiff was standing next to the front passenger-side window of Hunter's car, a few inches from the car.  (Id. at 33-34.)  Plaintiff did not see Hunter make any gestures except for appearing to put the car in reverse.  (Id. at 36.)  Plaintiff observed that Hunter remained seated upright, leaning a little forward, and did not see him duck down below the door panel or do anything with his hands except keep them on the steering wheel and the gearshift.  (Id. at 36-37.)  Plaintiff believes that one to two minutes elapsed between the time he approached Hunter's front passenger-side window and the time he was shot.  (Id. at 37.)

The  Philadelphia  Police  Department,  Internal  Affairs  Division  ("IAD"),  investigated Plaintiff's shooting.  (Pl.  Ex.  A.)  The IAD investigation found that Redanauer may have violated two police directives when he fired at Hunter, shooting Plaintiff:

Detective Redanauer had prior information that Benjamin Hunter may

5

be armed with a gun and wearing a bullet proof vest.  Nonetheless, the Detective stopped his vehicle in front of Hunter's car, a most vulnerable position.  Detective Redanauer laid across the front seat of the car, with one foot on the brake and fired out the passenger side window without sighting a target.  Therefore, considering the totality of the circumstances, Det. Redanauer may be in violation of Directive 10, Section II-E, which states, "Police officers should ensure their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overly aggressive, or improper actions.

Detective Redanauer observed P/O Small on the sidewalk directly adjacent to Hunter's car when he (Det. Redanauer) pulled in front of Hunter's car.  Therefore, Detective Redanauer may also be in violation of Directive 10, Section II-C, which states, "Police officers should not discharge their weapons when doing so will unnecessarily endanger innocent people."

(Pl. Ex. A at 8-9.)  The Internal Affairs Division recommended that Redanauer be suspended for twenty days as a result of these violations.  (Redanauer Dep. at 56.)  Redanauer served the twenty-day suspension.  (Id. at 56.)  In addition to the twenty-day suspension, Redanauer received instruction on Directive 10, the use of deadly force, and a counseling memo.  (Id. at 59.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes

demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322. "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact."  Boykins v. Lucent Technologies, Inc., 78 F. Supp. 2d 402, 407 (E.D. Pa. 2000). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. AEV, Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).  The Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

III.    DISCUSSION

A.    Section 1983 Claims

Section 1983 provides a remedy against "any person" who, under the color of the law, deprives another of his constitutional rights. 42 U.S.C. § 1983.  To establish a claim under § 1983, a plaintiff must set forth: (1) a deprivation of a federally protected right, and (2) commission of the deprivation by one acting under color of state law.  Lake v. Arnold, 112 F.3d 682, 689 (3d Cir.

1997).  Plaintiff claims that his shooting by Redanauer subjected him to an unreasonable seizure, thus violating his rights under the Fourth Amendment, and violated his right to substantive due process pursuant to the Fourteenth Amendment.  Defendants do not dispute that Redanauer was acting under color of state law at the time he shot the Plaintiff.  (Defs.' Mem. at 3.)  Defendants seek the entry of summary judgment on their behalf on Plaintiff's claims under both the Fourth and Fourteenth Amendments.

1.    The Fourth Amendment claim

The Fourth Amendment to the Constitution provides, in relevant part, that: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  U.S. Const. amend. IV.  Plaintiff claims that his shooting violated the Fourth Amendment's guarantee against unreasonable seizures because the shooting effected a seizure of his person through the use of excessive force.  "A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable."  Curley v. Klem, 298 F.3d 271, 279 (3d Cir.  2002) (citation omitted).  Defendants argue that they are entitled to summary judgment on this claim because Plaintiff cannot establish that Redanauer's actions amounted to a seizure of the Plaintiff under the Fourth Amendment.  Although a seizure occurs when "'an officer restrains the freedom of a person to walk away'" id. (quoting Tennessee v. Garner, 471 U.S. 1, 7 (1985)), the Supreme Court has explained that, to be actionable under Fourth Amendment, the seizure must be intentional:

> A Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when

8

there is a governmental termination of freedom of movement through
means intentionally applied.

Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989).  Plaintiff does not contend that Redanauer
intended to shoot him.  Indeed, he admits that Redanauer had no animosity towards him and that
Redanauer did not intend to shoot him.  (Small Dep. at 18, 40.)  Plaintiff contends that his seizure
was intentional for purposes of the Fourth Amendment because Redanauer knew that he was at the
front passenger-side door of Hunter's car when Redanauer fired in that direction, intending to shoot
Hunter.  The authority relied on by Plaintiff to support this proposition is inapposite.  Plaintiff relies
on Curley, in which the United States Court of Appeals for the Third Circuit found that defendant
Klem, a New Jersey State Trooper, violated the Fourth Amendment rights of Curley, a Port Authority
Police Officer, when he intentionally shot Curley, mistaking him for an armed criminal suspect who
had murdered a police officer.  Curley, 298 F.3d at 273, 279-80.  Plaintiff also relies on Jensen v.
City of Oxnard, 145 F.3d 1078 (9th Cir. 1998), in which the United States Court of Appeals for the
Ninth Circuit found that Jensen stated an unreasonable seizure claim against a fellow officer,
Sergeant Christian, who had allegedly violated Jensen's Fourth Amendment rights by using
excessive and unreasonable force by intentionally shooting him while under the mistaken belief that
Jensen was an armed criminal.  Id. at 1082-83 ("The allegation that Sergeant Christian, by
intentionally shooting at a figure he mistook to be an armed criminal, engaged in a Fourth
Amendment seizure is supported in the law.") (citing Brower, 489 U.S. at 596-97; Garner, 471 U.S.
at 7).  In the instant case, however, Redanauer, unlike Klem and Christian, did not intentionally fire
at the Plaintiff, mistakenly believing him to be someone else.  Redanauer intentionally fired at
Hunter and missed, striking Plaintiff by mistake.

Plaintiff also relies on Fisher v. City of Memphis, 234 F.3d 312 (6th Cir. 2000), in which the United States Court of Appeals for the Sixth Circuit found that the district court properly applied a Fourth Amendment analysis to a Section 1983 excessive force claim brought by a woman who had been shot when a police officer fired into the car in which she was a passenger. Id. at 315, 319.  The Sixth Circuit explained that, while "the Fourth Amendment does not apply to § 1983 claims 'which seek remuneration for physical injuries inadvertently inflicted upon an innocent party by police officers' use of force while attempting to seize a perpetrator'. . . police officers do seize any person who is a 'deliberate object of their exertion of force." Id. at 318 (quoting Claybrook v. Birchwell, 199 F.3d 350, 359 (6th Cir. 2000)).  The Sixth Circuit determined that the "car was the intended target of Defendant's intentionally applied exertion of force" and that, "[b]y shooting at the driver of the moving car, [the officer] intended to stop the car, effectively seizing everyone inside, including the Plaintiff." Id. at 318-19.  In this case, however, Hunter's car was not the intended target of Redanauer's intentional use of force, Hunter was, and the fact that Plaintiff was in the immediate vicinity of Hunter's car does not make him the intentional target of the deadly force directed toward Hunter.

Plaintiff asks us to extend the definition of a Fourth Amendment seizure to encompass the foreseeable, but unintended, victims of deadly force directed toward others.  Plaintiff has not identified any authority which supports the proposition that the Fourth Amendment protects individuals who are foreseeable victims of deadly force intentionally used against others and we have found none.  C.f. Schultz v. Braga, 455 F.3d 470, 482 (4th Cir. 2006) (noting that "the Fourth Amendment does not protect persons who were merely 'reasonably foreseeable victims' of excessive force inflicted upon another").  Indeed, the Third Circuit has explained that, unlike the situation

10

where the police intentionally shoot a person who is mistakenly believed to be a criminal, there is

no Fourth Amendment seizure where the police mistakenly shoot an innocent bystander while

attempting to shoot a criminal:

> if a police officer fires his gun at a fleeing robbery suspect and the
> bullet inadvertently strikes an innocent bystander, there has been no
> Fourth Amendment seizure.  If, on the other hand, the officer fires his
> gun directly at the innocent bystander in the mistaken belief that the
> bystander is the robber, then a Fourth Amendment seizure has
> occurred.

Berg v. County of Allegheny, 219 F.3d 261, 269 (3d Cir. 2000) (citing Medeiros v. O'Connell, 150

F.3d 164, 168-69 (2d Cir.1998); Rucker v. Harford County, 946 F.2d 278, 281 (4th Cir.1991);

Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 795 (1st Cir.1990); Brower, 489 U.S. at 596).  We

find, accordingly, that because Plaintiff was not the intended target of Redanauer's gunshot, he was

not subject to a Fourth Amendment seizure.  Defendants' Motion for Summary Judgment is,

accordingly, granted with respect to Plaintiff's Section 1983 claim for violation of his Fourth

Amendment rights.

2.    The Fourteenth Amendment claim

"The Due Process Clause of the Fourteenth Amendment provides: '[N]or shall any State

deprive any person of life, liberty, or property, without due process of law.'"  Daniels v. Williams,

474 U.S. 327, 331 (1986) (quoting U.S. Const. amend. XIV).  "'The touchstone of due process is

protection of the individual against arbitrary action of government.'"  County of Sacramento v.

Lewis, 523 U.S. 833, 845 (1998) (quoting  Wolff v. McDonnell, 418 U.S. 539, 558 (1974)).  The

Supreme Court has instructed that "only the most egregious official conduct can be said to be

'arbitrary in the constitutional sense.'"  Id.  at 846 (quoting Collins v. Harker Heights, 503 U.S. 115,

11

129 (1992)).  Consequently, "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'"  Id. at 847 (quoting Collins, 503 U.S. at 128).

Defendants argue that they are entitled to summary judgment on Plaintiff's substantive due process claim because Redanauer's actions were not conscience shocking.  The Third Circuit has explained that the determination of whether a particular action by a governmental official "shocks the conscience" depends upon the context of those actions:

> The question of whether a given action "shocks the conscience" has an "elusive" quality to it. Estate of Smith v. Marasco (Smith I), 318 F.3d 497, 509 (3d Cir. 2003).  At one end of the spectrum of culpable conduct, negligent behavior can never rise to the level of conscience shocking.  See Lewis, 523 U.S. at 849, 118 S.Ct. 1708 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").  At the other end of the spectrum, actions "intended to injure in some way unjustifiable by any government interest" are those "most likely to rise to the conscience-shocking level."  Id.  Acts that fall between the extremes of mere negligence and harmful intent require courts to make "closer calls," based on a context-specific inquiry.  Id.

Kaucher v.  County of Bucks, 455 F.3d 418, 426 (3d Cir. 2006).  The Third Circuit has instructed that we "evaluate the conditions under which a defendant acted in order to ascertain the relevant standard of culpability."  Id.  Consequently, if the official is "'confronted with a hyperpressurized environment such as a high-speed chase . . . it is usually necessary to show that the officer deliberately harmed the victim.'"  Id. (quoting Estate of Smith v. Marasco (Smith II), 430 F.3d 140, 153 (3d Cir. 2005)).  Where the official has the time to act "'in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience.'"   Id. (quoting Smith II, 430 F.3d at 153).  "Where a defendant has to act with some urgency, but does not have to make split-second decisions

. . . the defendant's actions must 'reach a level of gross negligence or arbitrariness that indeed shocks the conscience.'" Id. (quoting Miller v. City of Philadelphia, 174 F.3d 368, 375-76 (3d Cir. 1999)). In this last situation, in which a state actor may need to act "in a matter of hours or minutes" and where "there is some urgency and only 'hurried deliberation' is practical," the Third Circuit has instructed that "the relevant question is whether the officer consciously disregarded a great risk of harm." Sanford v. Stiles, 456 F.3d 298, 310 (3d Cir. 2006).

Defendants contend that, at the time he shot the Plaintiff, Detective Redanauer was "confronted with a hyperpressurized environment" and, since he did not intend to shoot the Plaintiff, his actions were not conscience shocking in a constitutional sense. We find, however, that there is evidence on the record upon which a jury could find that Redanauer did not have to make split-second decisions and, in fact, had, at a minimum, minutes to determine his course of action toward Hunter. Indeed, there is evidence on the record that Hunter was sitting upright in his car with both hands visible at all relevant times and did nothing to precipitate urgent action on the part of Redanauer. There is also evidence that Redanauer's own actions precipitated his use of deadly force. There is evidence that Redanauer's lack of planning and inability to communicate with his fellow police officers contributed to the urgency of his decision making. Moreover, the IAD found that Redanauer violated Directive 10, Section II-E which states: "Police officers should ensure their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overly aggressive, or improper actions." (Pl. Ex. A at 8.) We further find that there is evidence on the record upon which a jury could find that Redanauer consciously disregarded a great risk of harm to the Plaintiff, who Redanauer knew was standing next to the front passenger-side window of Hunter's car, when he blindly shot in Hunter's direction. (Pl. Ex. A at 8-9.)

13

Consequently, we find that there are genuine issues of material fact with respect to the standard that should be applied to Plaintiff's substantive due process claim and regarding whether Redanauer's actions were conscience shocking in a constitutional sense.  We hold, accordingly, that there are genuine issues of material fact regarding whether Redanauer violated Plaintiff's Fourteenth Amendment right to substantive due process.

Defendants also argue that Redanauer is entitled to the entry of summary judgment in his favor on Plaintiff's substantive due process claim because he is entitled to qualified immunity with respect to that claim.  Under the qualified immunity defense, "police officers performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Schultz, 455 at 476 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  There are two steps to the Court's inquiry regarding qualified immunity, the Court first determines whether, "viewing the facts in the light most favorable to the plaintiff, the officer has violated a particular constitutional right."  Id.  The Court then determines "whether that right was clearly established at the time of the violation."  Id. (citing Saucier v. Katz, 533 U.S. 194, 200 (2001)).  In considering whether the right was clearly established, we determine whether "'it would be clear to an objectively reasonable officer that his conduct violated [the constitutional] right.'" Id. (quoting Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002)).  However, where, as here, "there are unresolved disputes of historical fact relevant to the immunity analysis" a "a decision on qualified immunity [would] be premature."  Curley, 298 F.3d at 278.  Since there are material issues of fact for the jury regarding whether Redanauer's actions were conscience shocking, we find that there are "disputed, historical facts material to the objective reasonableness of [Redanauer's] conduct" which "give rise

14

to a jury issue" regarding his entitlement to qualified immunity.  Id.  Defendants' Motion for Summary Judgment is, therefore, denied as to Plaintiff's claim that Redanauer's actions violated his Fourteenth Amendment right to substantive due process.

      3.    The Monell claim

      The Complaint asserts a claim against the City of Philadelphia pursuant to Section 1983, averring that the City is responsible for the violation of Plaintiff's constitutional rights.  In Monell v. Dept. of Soc. Services, 436 U.S. 658 (1978), the Supreme Court established that municipal liability under 42 U.S.C. § 1983 may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights. 436 U.S. at 691-95. Thus, municipal liability attaches only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law. Andrews, 895 F.2d at 1480; see also Fletcher v. O'Donnell, 867 F.2d 791,793-94 (3d Cir. 1989) ("Custom maybe established by proof of knowledge and acquiescence.").

      A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered. Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984)). To establish causation,

a plaintiff must demonstrate a "plausible nexus" or "affirmative link" between the municipality's custom and the specific deprivation of constitutional rights at issue.  Bielevicz at 850 (citing Estate of Bailey by Oare v. County of York, 768 F.2d 503, 507 (3d Cir. 1985)).  Plaintiff, however, need not demonstrate that his injuries were the direct result of formal departmental procedures or encouragement in order to satisfy the nexus requirement.  Bielevicz at 850.

Plaintiff argues that the City of Philadelphia is liable to him in this case because of its failure to adequately train and supervise Redanauer in two areas: 1) the use of deadly force and 2) the execution of high-risk arrest warrants.  The Third Circuit has held that, on a failure to train claim, a plaintiff must identify a municipal policy or custom that amounts to deliberate indifference, which typically requires proof of a pattern of underlying constitutional violations, and must also demonstrate that the inadequate training caused a constitutional violation.  Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004).  Consequently, to survive summary judgment on a failure to train claim, the Plaintiff must present evidence that the need for more or different training was so obvious that the policymaker's failure to respond amounts to deliberate indifference.  Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001).  Defendants have moved for summary judgment on this claim on the grounds that the City provides training for its police officers regarding serving warrants and the use of deadly force and because Plaintiff has failed to point to a pattern of underlying constitutional violations.

As support for his contention that the City does not train its officers with respect to executing high-risk warrants, Plaintiff relies on Redanauer's deposition testimony that he was not given specific training regarding the use of back-up officers in executing an arrest warrant and that planning for such arrests is done on a case by case basis.  (Redanauer Dep. at 62-63.)  Redanauer

testified that he has not received specific training with respect to where backup officers should be situated, who should approach the suspect, and who should talk to the suspect.  (Id. at 63.)  He has, however, received annual training in officer safety, including how to safely conduct a vehicle stop. (Id. at 63-64.)  In addition, Sgt. Jefferson Campbell, who was assigned to the Philadelphia Police Department's 39th District, testified that the Police Department provides training in the use of backup officers in an arrest warrant situation on the street, including training with respect to communications during the arrest, who should approach the suspect and who should speak to the suspect.  (Campbell Dep. at 31.)

Plaintiff's expert on criminology, Paul McCauley, Ph.D., has opined, based upon the International Association of Chiefs of Police Training Keys, that the warrant for the arrest of Hunter was a high-risk warrant that required planning for safe and effective execution.  (Pl. Ex. D at 4.)  He further opined, based on the depositions of Plaintiff and Redanauer, that a "lack of officer training in executing recurring high-risk tactical operations that [are] likely to result in the use of deadly force, as under these circumstances, reflects a deliberate indifference to Officer Small's well being." (Id. at 10.)  He also opined that the lack of this training resulted in the reckless actions of the Philadelphia police officers that were direct causes of the harm suffered by Plaintiff.  (Id.)

Plaintiff has presented no evidence that the use of deadly force training that the City provides to its officers is inadequate.  We find, accordingly, that the City is entitled to the entry of judgment as a matter of law on Plaintiff's Monell claim to the extent that claim relies on the City's allegedly inadequate training on the use of deadly force.  Moreover, there is evidence that the City provides training for its officers regarding safely performing traffic stops and the use of backup officers in serving high-risk warrants.  Plaintiff has produced no probative evidence that this training is

17

constitutionally inadequate.  His reliance on his expert's opinion that a "lack of officer training in executing recurring high-risk tactical operations that [are] likely to result in the use of deadly force, as under these circumstances, reflects a deliberate indifference," is misplaced.  McCauley's opinion that the City did not provide adequate training in "recurring high-risk tactical operations" relies on the actions taken by the police officers involved with Hunter's arrest.  His opinion does not rely on any evidence with respect to the nature and quality of the Philadelphia Police Department's present training program regarding the execution of high-risk arrest warrants or high-risk tactical operations.  Indeed, his opinion cites no evidence of the City's training programs in this area.

By focusing "upon the actions of [Redanauer] instead of the policies of the city" Plaintiff "improperly extrapolates his experience with [Redanauer] as an indicia of inadequate police training citywide." DiJoseph v. City of Philadelphia, 947 F. Supp. 834, 842 (E.D. Pa. 1996).  The Supreme Court determined in City of Canton, Ohio v. Harris, 489 U.S. 378 (1989), that a plaintiff "cannot properly demonstrate that the City failed to train its police officers simply through proffering one example of police misconduct.   That alone is insufficient." DiJoseph, 947 F. Supp. at 842.  The Supreme Court explained  in Canton that, in a failure to train case, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." Canton 489 U.S. at 390-91 (citations omitted).  Moreover, it is not sufficient "to prove that an injury or accident could have been avoided if an officer had had better or more training . . .  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program . . . ." Id. at 391.  In focusing the inquiry on the municipality's training program, rather than

18

the officer's actions, the Supreme Court recognized that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." Id. We find that Plaintiff has not demonstrated that the training provided by the City to its officers regarding the execution of high-risk warrants or high-risk tactical operations is constitutionally deficient.

Defendants also argue that the City is entitled to summary judgment on Plaintiff's Monell claim because Plaintiff has not demonstrated that any failure to provide relevant training in this case amounts to deliberate indifference because Plaintiff has not shown a pattern of similar constitutional violations. Plaintiff has submitted no evidence of other persons who have been harmed by a lack of training with respect to the execution of high-risk warrants or high-risk tactical operations. Plaintiff argues that proof of such a pattern is not necessary in cases where there is an obvious need for training to avoid violations of constitutional rights. The Third Circuit has recognized that, although failure to train "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations . . . it is possible to maintain a claim of failure to train without demonstrating such a pattern." Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (citing Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 408-09 (1997)). However, a failure to train may be proven in the absence of a pattern of constitutional violations only "in a narrow range of circumstances" where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Bryan County, 520 U.S. at 409. The Supreme Court has explained that:

> The likelihood that the situation will recur and the predictability that
> an officer lacking specific tools to handle that situation will violate
> citizens' rights could justify a finding that policymakers' decision not

> to train the officer reflected "deliberate indifference" to the obvious
> consequence of the policymakers' choice--namely, a violation of a
> specific constitutional or statutory right. The high degree of
> predictability may also support an inference of causation--that the
> municipality's indifference led directly to the very consequence that
> was so predictable.

Id. at 409-10.  The Supreme Court has explained that a failure to train may be established without

a pattern of constitutional violations where, for example, city policymakers arm police officers with

firearms but fail to provide them with training in the use of deadly force.  See Canton, 489 U.S. at

390 n.10 (citing Tennessee v. Garner, 471 U.S. 1 (1985)).  Plaintiff has pointed to no authority for

a finding that situations such as the arrest of Hunter, where six police officers attempted to serve an

arrest warrant on an individual who was thought to be armed by making a traffic stop, falls in the

"narrow range of circumstances" where "a violation of federal rights may be a highly predictable

consequence of a failure to equip law enforcement officers with specific tools to handle recurring

situations."  See Bryan County, 520 U.S. at 409-10. We find that the situation which occurred here

is not the sort of situation which brings with it the "high degree of predictability [that] may support

an inference of causation." Id.  Consequently, we find that Plaintiff has not met his burden of

presenting evidence that the need for more or different training was so obvious that the City's failure

to provide this training amounts to deliberate indifference.  See Brown, 269 F.3d at 216. Defendants'

Motion for Summary Judgment is, therefore, granted with respect to Plaintiff's Monell claim.

> B.    The State Law Claims

The Complaint asserts claims against Redanauer under state law for violation of Article I,

Sections 1 and 8 of the Pennsylvania Constitution and for assault, battery, and negligent infliction

of emotional distress.  Redanauer has moved for summary judgment on Plaintiff's Pennsylvania

Constitutional law claim pursuant to <u>Jones v. City of Philadelphia</u>, 890 A.2d 1188 (Pa. Commw. Ct. 2006). The Commonwealth Court held in <u>Jones</u> that there is no right to monetary damages for violation of the Pennsylvania Constitution. <u>Id.</u> at 1216. Plaintiff concedes that <u>Jones</u> precludes his proceeding on his claim for violation of Article I, Sections 1 and 8 of the Pennsylvania Constitution. Defendants' Motion for Summary Judgment is, accordingly, granted with respect to Plaintiff's claim for violation of Article I, Sections 1 and 8 of the Pennsylvania Constitution.

Redanauer has also moved for summary judgment on Plaintiff's tort claims because those claims are barred by the Political Subdivisions Tort Claims Act, , 42 Pa. Cons. Stat. Ann. §§ 8541-64. "The Tort Claims Act waives the sovereign immunity of local governmental units and their employees only in connection with eight categories of 'negligent acts,' specifically: '(1) Vehicle liability. --The operation of any motor vehicle in the possession or control of the local agency . . . (2) Care, custody or control of personal property . . . (3) Real property ... (4) Trees, traffic controls and street lighting . . . (5) Utility service facilities . . . (6) Streets . . . (7) Sidewalks . . . (8) Care, custody or control of animals.'" <u>Lakits v. York</u>, 258 F. Supp. 2d 401, 406 (E.D. Pa. 2003) (quoting 42 Pa. Cons. Stat. Ann. § 8542(b)); <u>see also</u> 42 Pa. Cons. Stat. Ann. § 8545. These categories are strictly construed. <u>Lakits</u>, 258 F. Supp. 2d at 406 (citations omitted). Redanauer's shooting of Plaintiff obviously does not fall into any of these categories. Outside of these categories, a municipal employee may only be held liable in tort when his or her conduct "constituted a crime, actual fraud, actual malice or willful misconduct." Pa. Cons. Stat. § 8550. In order to prove willful misconduct, a plaintiff must establish that the actor specifically intended the result of his or her actions. <u>Bright v. Westmoreland County</u>, 443 F.3d 276, 287 (3d Cir. 2006) (quoting <u>Robbins v. Cumberland County Children and Youth Svcs.</u>, 802 A.2d 1239, 1252-53 (Pa. 2002)). Plaintiff has admitted that he does

not believe that Redanauer intended to shoot him.  (Small Dep. at 40.)  We conclude, accordingly, that Plaintiff's state tort law claims are barred by the Tort Claims Act.  Defendants' Motion for Summary Judgment is, therefore, granted with respect to Plaintiff's state law claims.

IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted with respect to the Section 1983 claim brought by Plaintiff in Count I of the Complaint for violation of his Fourth Amendment right to be free of unreasonable seizures.  Defendants' Motion for Summary Judgment is also granted with respect to the Monell claim asserted in Count I of the Complaint and with respect to the state law claims asserted in Count II of the Complaint.  The Motion for Summary Judgment is denied only as to Plaintiff's Section 1983 claim for violation of his Fourteenth Amendment right to substantive due process asserted in Count I of the Complaint.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTOINE SMALL, JR. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET AL. | : | NO. 05-5291 |

**O R D E R**

**AND NOW**, this 26th day of February, 2007, upon consideration of Defendants' Motion for Summary Judgment (Docket No. 12) and the documents filed with respect thereto, **IT IS HEREBY ORDERED** that the Motion is **GRANTED** in part and **DENIED** in part as follows:

1.  Defendant's Motion is **DENIED** with respect to Plaintiff's Section 1983 claim, asserted in Count I, that Detective Redanauer violated his Fourteenth Amendment right to substantive due process.

2.  Defendants' Motion is **GRANTED** in all other respects.

3.  **JUDGMENT** is hereby **ENTERED** in favor of the City of Philadelphia and against Plaintiff.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.